IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 15, 2015
**STATE OF TENNESSEE v. ADAM MOATES**

**Direct Appeal from the Criminal Court for Knox County**
**No. 102168      Steve W. Sword, Judge**

**No. E2014-02405-CCA-R3-CD – Filed March 16, 2016**

The appellant, Adam Moates, was convicted in the Knox County Criminal Court of two counts of attempted first degree premeditated murder, three counts of attempted second degree murder, and five counts of employing a weapon during the commission of a dangerous felony. After a sentencing hearing, the appellant received an effective twenty-six-year sentence. On appeal, he contends that the evidence is insufficient to support his attempted first degree murder convictions because it fails to show premeditation. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN, and D. KELLY THOMAS, JR., JJ., joined.

Bruce A. Alldredge, Knoxville, Tennessee, for the appellant, Adam Moates.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In August 2013, the Knox County Grand Jury indicted the appellant for five counts of attempted first degree premeditated murder and five corresponding counts of employing a weapon during the commission of a dangerous felony. The indictment related to the appellant's shooting into a home in which five people were present.

At trial, Officer James Lockmiller of the Knoxville Police Department (KPD) testified that on June 25, 2013, he responded to a call regarding a shooting that involved a black Pontiac with a gray racing stripe down the middle. Officer Lockmiller was in the area of the shooting and saw the suspect car on Woodland Avenue. The car turned onto Central Street, and Officer Lockmiller initiated a traffic stop. He ordered the driver, who was the appellant, out of the car and detained him. He then conducted a "safety sweep" and observed one live round of ammunition on the driver's seat and a green canvas bag on the driver's floorboard. He noticed "the silhouette of a handgun" in the bag.

Investigator Brian Moran of the KPD testified that on June 25, 2013, he responded to a report of a shooting in a home on West Churchwell Avenue. When he arrived, Linda Monholland was being treated by medical personnel in the hallway of the home, and four other people were "contained in the front room area on the couch."

Investigator Moran testified that Linda Monholland was removed from the scene and that he learned a suspect had been detained. He had the suspect, who was the appellant, brought to the house and took each victim outside, one by one, to identify the suspect. All of the victims identified the appellant as the person who shot into the house. The appellant was transported to the police department, waived his rights, and told Investigator Moran the following: The appellant went to the house on West Churchwell to exchange pills for sex with a woman named "Christy." He locked his wallet, which contained $2,000, in the glove box of his car and went into the bedroom with her. However, before they could have sex, she yelled that her boyfriend was there and that he had a gun. The appellant ran to his car, saw that his glove box was open, and discovered that his wallet was empty. He thought he had been set up, got a gun out of his car, and went to the back door because he wanted to know "how and why." He knocked, but no one answered, so he went to the front door and yelled, "Christy, I know you're in there. What's going on?" He claimed that "they said they had a gun" and that he "saw them flash a gun through the window." He ran and fired his gun toward the front door because he was trying to protect himself. He was not trying to shoot anyone. At first, the appellant denied knowing the location of his gun. However, when Investigator Moran advised the appellant that he was going to obtain a search warrant for the appellant's car, the appellant admitted that the gun was in the center console.

After the interview, Investigator Moran obtained a search warrant for the Pontiac. During the search, he found a semiautomatic handgun underneath a container that fit into the center console. One round of ammunition was in the chamber. Investigator Moran also found pills in the glove box.

On cross-examination, Investigator Moran testified that the appellant claimed he had been set up by one of the victims as a result of contact he made with the victim on the website "Back Page." Investigator Moran acknowledged that "it's not out of the ordinary for these things on Back Page to result in this kind of stuff."

Vernon Monholland testified that on June 25, 2013, he lived in a home on West Churchwell with his wife, Linda Monholland; son, Norris Monholland; and granddaughter. Norris's[1] girlfriend, Paula Dishmon, stayed at the house "ever[y] once in a while." That afternoon, Vernon's sister-in-law, Martha Stinnett, was also present, and Vernon, Linda, their granddaughter, and Stinnett were in Vernon's and Linda's bedroom, watching a movie. Vernon said he heard Dishmon yell, "[H]e's coming around the house with a knife." Vernon left the bedroom to see what was happening and heard a knock on the front door. He opened the door and saw the appellant standing at the door with a pistol in his right hand and "his hand on the trigger." Norris was standing behind Vernon, was holding Vernon's oxygen tank machine, and was going to hit the appellant with it if the appellant had a knife. The appellant saw Norris, and Vernon slammed the door.

Vernon testified that the appellant shot through the front window of the home and that the bullet "went right where Norris was standing." Vernon said he "went through the house" and heard a second gunshot. He went to the "bathroom/hallway area" and heard a third gunshot. His granddaughter, Linda, and Stinnett were in the bathroom. Linda told Vernon that she had been shot, Vernon saw blood on Linda's shirt, and Linda fell. At that point, Vernon heard a fourth gunshot, and a bullet came through the back of house and hit the bathroom door trim. Vernon stated that the bullet "missed me by that much" and that Norris telephoned the police. Vernon said he did not own a gun and did not point a gun at the appellant. Norris also did not have a gun or point a gun at the appellant.

On cross-examination, Vernon testified that while he was watching the movie, he was not paying attention to what Norris and Dishmon were doing and that he did not hear music in Norris's bedroom. He did not know if Dishmon invited the appellant to the house but said that he "wouldn't [have] allowed that." He stated that when he opened the front door, the appellant was pointing the gun toward his next door neighbor's house. The appellant was angry but did not say he was going to kill Vernon.

Linda Monholland testified that on June 25, 2013, she was watching television in her bedroom with her husband, granddaughter, and sister. Dishmon and Linda's son, Norris, were in Norris's bedroom. Linda's sister went into the bathroom, and Linda

---

[1] Because some of the victims share a surname, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

heard Dishmon scream that "he's got a knife, he's got a knife." Linda and her granddaughter ran toward the bathroom while Linda's husband went to the front door. Linda heard a gunshot and ran into the bathroom. She was talking with her sister and suddenly told her sister, "I just got shot." She stated that the bullet exited near her spine and that she was in the hospital for eighteen days.

On cross-examination, Linda acknowledged that in her first statement to police, she did not tell them that Dishmon said that "he's got a knife." She also acknowledged that Dishmon could have brought someone into the house without her knowing it.

Martha Stinnett testified that on June 25, 2013, she was watching a movie with Vernon, Linda, and their granddaughter and went into the bathroom. She heard what sounded like firecrackers, and Linda ran to the bathroom and tried to open the bathroom door. Stinnett said that "we finally got it open and then all of a sudden, I felt . . . like something was thrown in my face." Linda told Stinnett that she had been shot and collapsed onto the floor. Stinnett stated, "I guess the bullet, when it come through the shower, it passed me and hit my sister in the chest." Days later, Stinnett noticed a pair of gray boxer shorts on the back porch. The boxer shorts did not belong to anyone in the family.

Tiffany Hamlin of the KPD testified that on June 25, 2013, she collected evidence from the home on West Churchwell. Hamlin found two bullets: one in the living room wall and one in the hallway outside the bathroom. Hamlin also processed the Pontiac. An empty canvas bag was on the driver's floorboard, pills were in the glove box, a nine-millimeter round of ammunition was on the driver's seat, and a handgun was in the center console. The gun was ready to fire. Hamlin found a digital scale and a box of Ziploc storage bags in the trunk. On cross-examination, Hamlin acknowledged that she also found a bra in the car. At the conclusion of Hamlin's testimony, the State rested its case.

The appellant testified that in June 2013, he was married with a son and worked at Chick-fil-A. He also sold Xanax and marijuana. On June 25, the appellant consumed Xanax and Percocet before he went to work and more Xanax during work. The appellant's shift ended about 2:00 p.m. He said he smoked marijuana after work and "looked on Back Page to try to find someone to get rid of the extra Xanax that I had." The appellant said that he used Back Page because prostitutes usually had cash to buy pills and that he found someone named "Christy" who wanted to buy Xanax. The appellant telephoned Christy, and she told him to meet her at the home on West Churchwell. He said that he did not leave right away and that Christy "kept calling and texting me wondering where I was at, trying to hurry me up." The appellant went to the residence, and Paula Dishmon directed him to park behind the house. The appellant had about 200 Xanax pills. He took a handful of pills, hid the rest in the glove box of his car,

and locked the glove box. The appellant said that he kept a gun in his car "24/7," that he concealed everything he had of value in the car, and that he locked the car.

The appellant testified that Dishmon walked him into the house through the back door and led him into a bedroom next to the back door. He said that they talked for a few minutes, that she crushed one of the pills with her fingers, and that she snorted it with a straw. The appellant removed his shirt, pants, socks, shoes and underwear but put his pants back on. The bedroom was messy with clothes all over the floor, and loud music was playing. Suddenly, Dishmon told the appellant that her boyfriend was coming, that he had a gun, and that he was going to kill the appellant. The appellant grabbed his clothes off the floor and ran out the back door to his car. He said the bra found in his car must have been in his hand when he ran out the door. The appellant unlocked his car, got in, and realized that someone had broken into the vehicle. The glove box was "hanging down," and the appellant's cellular telephone and $2,000 in cash were missing. However, the Xanax pills, which had been well-hidden, were still in the glove box.

The appellant testified that he thought he had been "set up" and that he assumed Dishmon was responsible. The appellant wanted to ask Dishmon what happened to his property and took his gun out of the center console. An empty magazine was in the gun, so he removed the magazine and inserted a loaded magazine. The appellant said that he was not going to shoot anyone and that he took the gun with him for protection.

The appellant testified that he went to the back door and tried to open it but that it was locked. The appellant went to the front door and knocked "to see if anyone would talk to me." At that time, his gun was in the left pocket of his jeans. The door opened "to an extent," and the appellant saw two men. The appellant said the younger man had an "aggressive posture" and "what looked like in his hand a metal object, clearly not a knife, it was black. So I assumed it was a gun[.]" The door slammed before the appellant could say anything, and the appellant backed away. He said that he was afraid and that he thought Dishmon's boyfriend could harm him. The appellant then saw "what looked like him holding a gun through the window," so the appellant fired a gunshot at the window and ran around toward his car. The appellant thought he heard footsteps, was afraid, and fired a second shot "somewhere around the side of the house." When the appellant got to his car, he "thought someone might be trying to come out the back door after [him]," so he fired a third shot at the back door. The appellant got into his car and drove away but was stopped a few minutes later by police. He said that he was right-handed but fired all three shots with his left hand and that he fired into the home because he thought his life was in danger.

On cross-examination, the appellant acknowledged that he could have left after he realized his property had been taken. He also acknowledged that despite his being afraid,

he got the gun and returned to the house to confront Dishmon. The appellant did not call the police because Xanax pills were in his glove box, and he did not want the police to arrest him. The appellant said he took the gun with him because he planned to shoot back if someone shot at him.

The appellant testified that when the front door opened, he saw Norris Monholland standing beside Vernon Monholland and Dishmon standing behind the two men. When the door slammed, the appellant pointed the gun in the "vicinity" of the front window because he thought someone was trying to shoot at him. He acknowledged that in order to fire his weapon, he had to remove the safety and "rack" the gun. The appellant ran off the porch, heard footsteps, and fired the second shot in the "vicinity" of the house. When the appellant got to his car, he fired the third shot. He said that he did not shoot directly at the back door but acknowledged that the bullet struck the center of the door.

Paula Dishmon testified that in June 2013, she was dating Norris Monholland, who had just been released from prison. On June 25, Dishmon was at the Monholland residence, and Norris was "with his cousin somewhere." Norris's family was in the house but asleep. The appellant found Dishmon's telephone number on Back Page and sent her a text message, asking if she wanted Xanax. Dishmon said she "was like, crap, yeah" and told the appellant to "come on over." When the appellant arrived, she did not want anyone to see him, so she told him to come in the back door.

Dishmon testified that she and the appellant went into the bedroom, that she snorted four or five pills, and that the appellant told her she could have the pills "for companionship." Dishmon and the appellant had sex, took a shower, and returned to the bedroom. At that point, the Xanax Dishmon had snorted "start[ed] kicking in." She heard a knock on the front door and told the appellant that her boyfriend would kill the appellant if he caught the appellant there. Dishmon denied that she invited the appellant to the house in order take his property. She said that she did not know anyone was going to break into his car and that "I honestly don't even believe he was robbed." Defense counsel asked Dishmon why the appellant would return to the house to confront her, and she stated, "Maybe because he didn't get to spend the full hour with me[.] . . . I promised him he could stay an hour." She denied telling her mother that the appellant had been "robbed."

On cross-examination, Dishmon testified that when Norris knocked on the front door, she snuck the appellant out the back door. She said that "[e]verything seemed fine and then there was another knock on the front door[.]" Vernon Monholland awoke and "as soon as he opens the door, we see a gun, and he said, oh, my God, he's got a gun." Dishmon saw the gun in the appellant's hand, and Vernon shut the door. Dishmon stated that "the next thing I know, bullets just start coming through the house, and we're

- 6 -

screaming." Dishmon, Linda Monholland, and the Monhollands' granddaughter went into the bathroom, and a bullet "flew by" Dishmon and hit Linda in the chest. Another bullet hit the "opposite side of the door." On redirect examination, Dishmon testified that the appellant "was like pretty much almost dressed" when he ran out the back door to his car and that she "thought everything was cool."

Rose Castaneda, Dishmon's mother, acknowledged that she spoke with an investigator before trial. She also acknowledged telling the investigator that Dishmon claimed the appellant had been robbed. On cross-examination, Castaneda testified that Dishmon learned about the robbery from talking with the Monhollands.

After Castaneda's testimony, the jury convicted the appellant as charged in counts three and seven of the attempted first degree premeditated murder of Norris and Vernon Monholland, respectively, Class A felonies. Regarding counts one, five, and nine, the attempted first degree premeditated murder of Linda Monholland, Paula Dishmon, and Martha Stinnett, respectively, the jury convicted the appellant of the lesser-included offense of attempted second degree murder, Class B felonies. The jury also convicted the appellant as charged in corresponding counts two, four, six, eight, and ten of employing a weapon during the commission of a dangerous felony, Class C felonies. After a sentencing hearing, the trial court sentenced the appellant in counts three and four to consecutive sentences of twenty and six years and in counts seven and eight to consecutive sentences of twenty and six years. In counts one and two, the trial court sentenced the appellant to consecutive sentences of twelve and six years. In counts five and six and in counts nine and ten, the trial court sentenced the appellant to consecutive sentences of ten and six years. The trial court ordered that the appellant serve the sentences in counts one, three, five, seven, and nine concurrently for a total effective sentence of twenty-six years.

## II. Analysis

The appellant claims that the evidence is insufficient to support his convictions for the attempted first degree premeditated murders of Norris and Vernon Monholland because it fails to show premeditation. Specifically, he contends that the evidence fails to show that he made any statement of an intent to kill the victims, that he procured a weapon for the purpose of killing the victims because he always kept a gun in his car, that he made preparations before the shooting to conceal his actions, that the shooting was particularly cruel, or that he was calm immediately after the shooting. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the

light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. <u>Id.</u> Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" <u>State v. Rice</u>, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting <u>Marable v. State</u>, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. <u>State v. Davidson</u>, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. <u>Bland</u>, 958 S.W.2d at 660. In <u>State v. Nichols</u>, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of

evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

A person commits criminal attempt when, acting with the kind of culpability otherwise required for the offense, the person

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a).

Taken in the light most favorable to the State, the evidence established that the appellant was angry because he thought Paula Dishmon was responsible for someone breaking into his car and taking his property, including $2,000 in cash. The appellant claimed that he thought Dishmon's boyfriend was dangerous and that he was afraid. However, instead of leaving or contacting the police, he got a gun out of his car, inserted a loaded magazine, and returned to the back door to confront Dishmon. Finding the door locked, the appellant again could have left but instead proceeded to the front door. When Vernon Monholland opened the door, the appellant saw Norris holding Vernon's oxygen machine. Vernon, Norris, and Dishmon saw the appellant holding a gun, and the appellant's hand was on the trigger. Vernon slammed the door, and the appellant fired toward the front window, narrowly missing the two men. Although the appellant claimed that he thought someone was pointing a gun out the window at him, nothing indicates that Vernon or Norris had a gun, and the jury obviously discredited the appellant. The appellant fired two additional shots while running back to his car and hid the gun

underneath the container in the center console.  He later denied knowing the location of the gun.  In short, the appellant's motive for the shooting, his procurement of a weapon and loading that weapon, his repeated use of the weapon despite his being in no immediate danger, and his concealment of the weapon after the shooting support a finding of premeditation.  Thus, the evidence is sufficient to support the convictions.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE